# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 18, 2000, Session

## HENRY EUGENE HODGES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 90-S-1418, Walter C. Kurtz, Judge**

---

**No. M1999-00516-CCA-R3-PD - Filed October 20, 2000**

---

The appellant, Henry Eugene Hodges, seeks post-conviction relief from his 1992 first degree murder conviction and sentence of death. The Davidson County Criminal Court denied the appellant's petition and this appeal was taken. This court is presented with the following issues: (1) the effectiveness of trial counsel; (2) the post-conviction court's failure to provide funds for expert services; and (3) the post-conviction court's denial of a continuance and refusal to bifurcate the post-conviction evidentiary hearing. Following review of the record, we conclude (1) the appellant was not denied the effective assistance of counsel; (2) the post-conviction court properly denied the appellant's request for funds for additional expert services; and (3) the post-conviction court properly denied the appellant's request for a continuance of the evidentiary hearing. Accordingly, we affirm the post-conviction court's finding that the appellant is not entitled to post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J. and NORMA MCGEE OGLE, J., joined.

Thomas F. Bloom and Patrick T. McNally, Nashville, Tennessee, for the appellant, Henry Eugene Hodges.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Kathy Morante, Assistant Attorney General, Victor S. (Torry) Johnson, III, District Attorney General, and Tom Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this capital case, the appellant, Henry Eugene Hodges, appeals the judgment of the Davidson County Criminal Court denying his petition for post-conviction relief. In 1992, the

appellant entered guilty pleas to first degree premeditated murder[1] and especially aggravated robbery.[2]  At a subsequent sentencing hearing, the jury found the presence of three aggravating circumstances and imposed a sentence of death by electrocution[3] for the first degree murder conviction.[4]  The appellant's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court.  See State v. Hodges, 944 S.W.2d 346 (Tenn.), cert. denied, 522 U.S. 999, 118 S.Ct. 567 (1997).

On December 11, 1997, the appellant filed a *pro se* petition for post-conviction relief.  The court appointed counsel and amended petitions were filed on March 24, 1998, and on June 11, 1998. A hearing was held on January 20, 1999.  On February 8, 1999, the post-conviction court entered an order denying the appellant post-conviction relief.

On appeal, the appellant raises the following issues:

I.  Whether the appellant received the effective assistance of counsel;[5]

II.  Whether the post-conviction court's denial of funds for expert services impinged upon the appellant's constitutional rights;

III.  Whether the appellant's constitutional right to due process was violated by the post-conviction court's refusal to bifurcate the evidentiary hearing; and

---

[1] The appellant entered guilty pleas to both premeditated murder and felony murder.  The court merged the pleas into one count of first degree premeditated murder.

[2] Although not at issue in this appeal, a sentence of forty years was imposed for the conviction of especially aggravated robbery.  This sentence was ordered to be served consecutive to the death penalty.

[3] Effective July 1, 1999, Tenn. Code Ann. § 40-23-114 was amended to permit "[a]ny person who commits an offense prior to January 1, 1999, for which such person is sentenced to the punishment of death may elect to be executed by lethal injection by signing a written waiver waiving the right to be executed by the method of execution in effect at the time the offense was committed."

[4] Specifically, the jury found (1) the appellant has previous convictions for violent felonies; (2) that the murder was especially "heinous, atrocious or cruel;" and (3) the murder was committed while appellant was engaged in the commission of a robbery. Tenn. Code Ann. § 39-13-204(i)(2), (i)(5), and (i)(7) (1991).

[5] Within this general challenge, the appellant presents four specific allegations of ineffectiveness: (1) counsel was ineffective for failing to investigate, identify and challenge the State's proof as to aggravator (i)(5); (2) counsel was ineffective for failing to challenge fingerprint evidence; (3) counsel was ineffective by making a "hasty" decision to enter the guilty plea; (4) counsel was ineffective, *per se*, because of the systemic deficiencies in the State of Tennessee's indigent defense system; and (5) counsel was ineffective for failing to conduct a competent mitigation investigation, adopting a mitigation theory not based on adequate investigation and failing to develop additional mitigation themes. Each allegation will be discussed *infra*.

IV. Whether the errors and omissions identified in claims 1 through 20 of the Verified Amended Petition for Post-Conviction, either individually or cumulatively, violated the appellant's constitutional rights.[6]

After review of the record before this court, we affirm the post-conviction court's denial of relief.

## Background

In 1990, the twenty-four-year old appellant and his fifteen-year-old girlfriend, Trina Brown, were living with the appellant's brother in Smyrna when they decided to move to Florida.[7] In order to finance the move, the appellant, who on occasion engaged in homosexual prostitution advanced the plan, that he would rob and kill the next person who propositioned him. The appellant discussed with his girlfriend how the crimes would be carried out.

On the night of May 14, 1990, the appellant and Miss Brown went to Centennial Park in Nashville in furtherance of their plan. The victim, Ronald Bassett, approached the appellant and the

---

[6] These claims are identified in the "petition" as follows:
Claim I: Ineffective assistance of counsel at the guilt stage;
Claim II: Ineffective assistance of counsel at the sentencing stage;
Claim III: Ineffective assistance of counsel on direct appeal;
Claim IV: State's failure to relinquish Brady material at guilt stage;
Claim V: State's failure to relinquish Brady material at sentencing stage;
Claim VI: State knowingly used false testimony at sentencing stage;
Claim VII: Involuntary guilty plea;
Claim VIII: Unconstitutional intrusion into defense preparation for sentencing stage;
Claim IX: Denial of jury based on fair cross-section of the community;
Claim X: Unconstitutional restriction of voir dire;
Claim XI: Unconstitutional voir dire rulings;
Claim XII: State obtained promise from prospective jurors to do their "duty and obligation;"
Claim XIII: The prosecution engaged in conduct seeking to inflame the jury;
Claim XIV: Unconstitutional denial of expert services;
Claim XV: Unconstitutional preclusion of mitigating evidence;
Claim XVI: Unconstitutional sentencing phase instructions;
Claim XVII: Unconstitutional application of aggravating circumstances;
Claim XVIII: Death penalty statute is unconstitutional;
Claim XIX: Denial of right to allocution; and
Claim XX: Inadequate proportionality review.

[7] In view of the fact that the appellant pled guilty to first degree murder and neither the transcript of the guilty plea hearing or the jury sentencing hearing were included in the record, any development of the facts preceding the victim's death is limited. For purposes of background information, we recite those facts contained in our supreme court's decision in State v. Hodges, 944 S.W.2d at 349-351.

two men agreed to go to the victim's residence. They left together in the victim's vehicle. Ten or fifteen minutes later, Hodges returned to the park on foot. Accompanied by his girlfriend, the appellant drove his car back to the victim's residence. Upon arriving at the victim's residence, the appellant advised his girlfriend to remain where she was as he exited the car. The appellant later returned to the vehicle wearing gloves and asked his girlfriend to come with him into the house.

Upon entering the residence, Miss Brown observed the victim, alive, laying face down on the bed in his bedroom with a pillow over his head. The appellant had bound the victim's feet together with duct tape and had handcuffed his hands. While the victim lay helplessly, the appellant and his girlfriend ransacked the house. After obtaining the "person identification number" of the victim's automated teller card, the couple took a break, drank a Coke, and discussed whether to kill the victim. The appellant's girlfriend told him to kill Bassett so they could not be identified. The appellant then went into the bedroom and, ignoring the victim's pleas not to kill him, strangled Bassett to death with a nylon rope. Miss Brown testified that she heard Bassett moan and make a choking sound. She stated that it took about five minutes for the victim to die.

After the killing, the appellant attempted to erase any evidence of his presence by wiping off various items in the residence. He then turned the air conditioner in the bedroom on high to prevent deterioration of the body. He and Miss Brown left the residence, taking the victim's automobile and several items of personal property, including jewelry, a gun and a VCR. After withdrawing four hundred dollars from the victim's bank account, the pair returned to the home of the appellant's brother and retired to bed.

The following day, the appellant learned that the victim's body had been discovered. He and his girlfriend abandoned the victim's car in rural Rutherford County and they drove to Georgia in their own vehicle. The couple were eventually arrested in North Carolina. Personal property belonging to the victim was found in their possession; the appellant's fingerprints were discovered inside the victim's residence; and Miss Brown had been video-taped withdrawing money with the victim's automated teller card.

While incarcerated in the Metro jail pending trial, the appellant provided interviews to a television reporter admitting to the murders of eight persons including that of Bassett. These interviews were aired in the Nashville area.

Testifying for the State at the sentencing hearing, Dr. Charles Harlan, the chief medical examiner for Metropolitan Nashville and Davidson County, confirmed that Bassett had died of ligature strangulation. Dr. Harlan opined that Bassett would have remained alive and conscious for at least three and perhaps as long as five minutes during the strangulation. Harlan also found abrasions on the victim's wrists consistent with handcuffs.

The State proved that the appellant was previously convicted of armed robbery, attempted kidnaping and robbery in Hamilton County in 1984. The State also established that the appellant was convicted of murder in Fulton County, Georgia, in July 1990. The record reveals that the Georgia homicide occurred when the appellant and Miss Brown traveled to Atlanta after murdering

-4-

Bassett. After arriving in Georgia, Hodges made arrangements with a male to engage in homosexual acts for an agreed price. Hodges accompanied the man to his motel room, but when the man was unable to pay the agreed price, Hodges murdered him.

At the sentencing hearing the appellant, the appellant's mother, his brothers and Dr. Barry Nurcombe, a child psychiatrist, presented mitigating proof on behalf of the defense. This proof showed that the appellant was the next-to-youngest of his mother's five sons. His mother and father were not married. His father was actually married to another woman, but engaged in what one of the witnesses described as an "irregular union" with the appellant's mother for eighteen years. The appellant's father abused the appellant's mother and was strict with the appellant's brothers, three of whom were the children of another man. The appellant, however, was his father's favorite and was spoiled. Financial difficulties forced the family to move about frequently, and the appellant's father supported the family only sporadically.

The defense introduced proof to show that Hodges seemed normal until he was twelve years old. At that time, he began to associate with older boys, sniff glue and gasoline, be truant from school, and run away from home. He also engaged in sexual activities with his younger brother and attempted sexual activities with a female cousin. Due to his behavior, he was placed in a juvenile facility in Chattanooga.

A substantial portion of the mitigating proof focused upon the appellant's sexual abuse by a stranger when the appellant was twelve years old. According to the appellant, he accepted a stranger's offer of a ride home when he was playing a short distance from his home on Fessler's Lane in Nashville. Rather than driving Hodges home, the stranger drove Hodges to his home and raped him. Fearing rejection by his homophobic father and driven by guilt, the appellant told no one of this incident until he was arrested in 1990. The appellant contends that this victimization became the catalyst and major contributing cause of his delinquent and later criminal lifestyle.

Dr. Nurcombe testified that, while the appellant suffered from an antisocial personality disorder, low self-esteem, and substance (marijuana) abuse, the killing was motivated by a subconscious desire for revenge for the sexual abuse inflicted on him when he was twelve. This was coupled with Hodges' fear that his family might discover that he was engaged in homosexual prostitution since Miss Brown had told Hodge's sister-in-law shortly before the killing that he was a homosexual prostitute. The defense also introduced testimony that Miss Brown dominated and manipulated the appellant.

In rebuttal the State called Dr. James Kyser, a forensic psychiatrist, and Dr. Leonard Morgan, a clinical psychologist. Both had examined the appellant and concluded that he suffered from an antisocial personality disorder. They described persons with this disorder as having "no conscience," being "self centered," being "notoriously dishonest and untruthful," and having "very little regard for the feelings of others and . . . willing to use any means to get what they want, no matter who it hurts." While acknowledging the complicated factors involved in antisocial personality disorders, the State's experts discounted the singular importance of the one incident of alleged sexual abuse in

causing the appellant's actions. Dr. Morgan concluded that the appellant "was in complete control of his behavior" and not suffering from mental illness or emotional disturbance.

## Post-Conviction Hearing

In a post-conviction proceeding, the appellant must prove the allegations contained in his petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). Findings of fact and conclusions of law made by the post-conviction court are given the weight of a jury verdict, and, this court is bound by those findings unless the evidence contained in the record preponderates otherwise. Davis v. State, 912 S.W.2d 689, 697 (Tenn. 1995). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Additionally, questions concerning credibility of witnesses and the weight and value to be given their testimony are for resolution by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

The above standards are modified when the claim for relief is ineffective assistance of counsel. In State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999), our supreme court held that "[c]ases that involve mixed questions of law and fact are subject to *de novo* review." (citing Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997)). Specifically, the supreme court determined that issues involving alleged deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact. See Burns, 6 S.W.3d at 461. Although we perform a *de novo* review of the issue, the appellant must still establish his allegations by clear and convincing evidence. See Tenn.Code Ann. § 40-30-210(f) (1997).

## Evidence Presented at the Post-Conviction Hearing

Attorneys Donald Dawson, Michael Terry and Brock Mahler were appointed at the trial level to represent the appellant in this case. Since his appointment in 1996, Dawson has held the position of Post-Conviction Defender for the State of Tennessee and represents capital case petitioners in state post-conviction and federal habeas corpus proceedings. See Tenn. Code Ann. § 40-30-302 *et seq*. (1997). Prior to his appointment, he was in the private practice of law in the areas of employment discrimination and criminal defense. Dawson also had previous work experience with both the federal and state public defender's offices. He had tried one other capital case prior to his appointment to the appellant's case. Dawson stated that he represented the appellant both at the trial level and on appeal, although he conceded that he had a minor role in the appeal.

At the time of Dawson's appointment to this case in February 1991, he was involved in a "major [federal] tax criminal case in Memphis." He advised the trial court of his involvement in the federal case and that it would not be prudent for him to accept appointment. The trial court informed Dawson that the appellant was incarcerated in Georgia and would not be returned to Nashville until July or August. The appellant was returned to Tennessee custody some time in April. Because of his involvement in the federal case in Memphis during this time, Dawson was unable to do any substantive work in the appellant's case. In fact, Dawson recalled that he did not "file any motions or begin actual work on the case until after [he] returned from Memphis."

Dawson testified that the law firm he was with at the time of his appointment had dissolved and, in August 1991, he had joined another law firm. The pressure to generate fees at his new firm highly impacted the amount of time he devoted to the appellant's case. He related that he primarily worked on the appellant's case outside of his regular practice, on the weekends and evenings. He admitted that he should not have accepted appointment to the appellant's case because his financial concerns impeded his ability to work on the case. Notwithstanding, Dawson stated that he began working "in earnest" on this case in late September or early October 1991. Until this time, the defense team had not developed any defense theory of the case. Dawson stated that developing a strategy was frustrated by the appellant's public confession to eight murders.

Dawson testified that Brock Mahler came on board as third counsel in the case. Mahler was responsible for working on mitigation issues and psychological issues. Not only was this Mahler's first capital case, but also his first trial of any kind. Preparation on the mitigation theory began in October after the trial was scheduled for the later part of January. Dawson testified that this was not sufficient time to prepare a persuasive mitigation defense. Specifically, since the defense relied primarily on the appellant's own statements, *i.e.*, he had been kidnapped and raped by a homosexual male when he was an adolescent, there were numerous persons that needed to be interviewed to corroborate these statements. There was no attempt to try to obtain records from the Georgia Diagnostic Center which would have provided corroboration in that the appellant related this rape incident to a doctor in the Georgia penal system. Additionally, there was no attempt to obtain the statements of individuals who could have confirmed a change in the appellant's character and behavior at the time of the rape. Notwithstanding, the defense team did interview Dr. Nurcombe, the appellant's mother, his brothers, and one person in the community. Dawson admitted that these witnesses testified and helped establish the change in the appellant's behavior; additionally, he noted that "juries rely a lot more on lay witnesses than they do on professional witnesses." He stated, however, that additional witnesses "would have made it more real to the jury." Dawson confirmed that it was important for the purpose of establishing credibility to have obtained this information.

Dawson emphasized the mistake of relying solely on a psychiatrist, rather than hiring the services of a mitigation consultant. He explained that a mitigation consultant considers the fields of sociology, psychology, and other related areas in processing information about a defendant to establish a complete portrayal of the subject's life. Additionally, Dawson took responsibility for the court's denial of the defense motion for funds for a drug and alcohol expert.

In making the decision to enter a plea of guilty to the charge of first degree murder, Dawson testified that neither he nor anyone else associated with the defense traveled to Georgia, where the appellant was incarcerated, or North Carolina, where the appellant was arrested, in order to undertake a factual investigation. He explained that the defense team did not have adequate time to conduct such investigations. Additionally, he admitted that the defense team did not file a motion for funds to travel to Georgia and North Carolina, a motion for funds for a fingerprint examiner, a motion to suppress evidence, or a motion for a forensic pathologist to assist in the cross-examination of the State's medical expert. Dawson did admit, however, that the defense team did present a challenge

to the medical examiner's testimony in its motion for new trial.[8] Specifically, the medical examiner had testified that the victim would have been rendered unconscious three to five minutes prior to death; the defense team subsequently learned that a person would lose consciousness in thirty seconds.

Dawson testified that, over the weekend preceding the scheduled trial, the defense team determined that the "guilt-innocence phase [was] hopeless. That there was no way we were going to convince anybody that Mr. Hodges didn't kill the victim in this matter." The defense team concluded that, in order to gain credibility with the jury at the sentencing phase, the better strategy would be to plead guilty. In hindsight, Dawson related that had they proceeded to trial at the guilt phase, they would have been able to "begin to introduce [their] mitigation theories." He admitted that he "had not done the sort of serious legal research that should have been done on an issue like that." Dawson stated that he was only being compensated $20-$30 per hour in-court to represent the appellant. He admitted that this meager compensation was considered in the defense strategy. Another factor in the decision to plead guilty was the intent to surprise the State so they would not be able to introduce as much proof at the sentencing phase.

Dawson spent 228.1 out-of-court hours and 58 in-court hours on this case, however, he did not believe that this was sufficient. He further stated, though, that he probably spent more time on the case than he billed. According to Dawson, Mahler spent well over 300 hours working on this case prior to trial. Mahler was employed by the Capital Case Resource Center and, therefore, did not receive any reimbursement from the courts for his work on this case.

Dawson admitted on cross-examination that the defense team had filed a bill of particulars in this case and approximately fifty motions. He also filed numerous special requests for jury charges. He conceded that the attorneys had a good working relationship with the appellant. He admitted that the proof of the appellant's guilt was overwhelming, *i.e.*, the appellant had made numerous public statements as to his culpability; his fingerprints were found at the scene; personal belongings of the victim were located in the appellant's possession at the time of his arrest; and the appellant's girlfriend had provided a statement implicating the appellant. He acknowledged that the decision to plead guilty was a tactical decision, although, as he explained, entered without sufficient investigation and preparation.

Dawson stated that the appellant commended the defense team and thanked them for their representation. He added that the appellant never complained at any time regarding counsel's representation. At one point in the appeal process, the appellant indicated that he wanted to withdraw his appeal and be executed, however, Dawson and Terry convinced him to pursue his appeal. Dawson concluded by stating,

---

[8] See Tenn. Code Ann. § 39-13-204(k) (motion for new trial may be filed for both guilt or sentencing hearing following conviction in capital cases).

my feeling is that we failed in some fundamental ways to properly protect Mr. Hodges. That, you know, we clearly, obviously from the result, we didn't convince the jury of the mitigation or the weight of the mitigation that we presented. And I believe that there is, there are things that we should have done in terms of additional investigation that would have made that mitigation case stronger, to the extent that we had a duty to do those things and to prepare the mitigation, to come up with a more, I guess, compelling theory. Not theory but manner in which we presented the case, this would be through putting it on as a guilty-innocence case first. Then starting out mitigation, there and continuing it into the sentencing phase, that we failed in some fundamental ways that had we done sufficient legal research and investigation, we would not have made those errors. . . .

Michael Terry was appointed to represent the appellant in April or June 1991. At the time of his appointment, he had tried one capital case to conclusion and was involved in another exhausting capital case which was tried for three weeks in July 1991.

Terry stated that after the appellant was returned to Nashville, he started giving interviews to the local news stations describing himself as a serial killer. Terry advised the appellant to stop giving interviews. Notwithstanding these initial consultations, Terry stated that he did not actually start working on the appellant's case until August. The appellant's trial began in January 1992. Terry concluded that the period from August to January was insufficient time to prepare for trial. He stated that in order to effectively represent a defendant charged with a capital crime, he would need to devote six months solely to that case. Indeed, he stated that anywhere between 1500 and 1800 hours are "required to be effective in [capital] cases. And short of that is not effective representation." He claimed that he spent 256 out-of-court hours and 69.5 in-court hours for his work on this case. Terry explained that, during this time, the fees paid to appointed counsel representing indigent appellants resulted in a financial strain for himself. He stated the $20 per hour paid in appointed cases for indigent defendants was "not going to get you effective assistance in this kind of case."

Terry testified that he cross-examined Dr. Harlan during the sentencing hearing. Terry conceded that he had never talked with Dr. Harlan until immediately prior to his testimony at the sentencing hearing and admitted that he should have been more prepared for Dr. Harlan's testimony. He explained that he did not question Dr. Harlan prior to trial because "[w]e didn't think that there was any issue about the cause of death. And we did not anticipate that Harlan would exaggerate that time to four minutes." Notwithstanding, Terry elicited from Harlan on cross-examination that it was possible that the victim was conscious for less than three minutes. Moreover, at the motion for new trial, the defense team unsuccessfully attempted to attack the veracity of Dr. Harlan's testimony based upon evidence that the victim would not have been conscious for more than 30 seconds. Terry admitted that he was unprepared; he should have vigorously cross-examined Harlan; he should have interviewed him prior to trial; and he should have obtained a forensic pathologist to rebut Harlan's testimony.

-9-

Regarding the appellant's entry of a guilty plea, Terry admitted that the decision was made the week prior to trial. He stated that the decision was, in part, to be a demonstration of remorse for the jury. Reflecting upon this decision, Terry opined that pleading guilty was a mistake for several reasons. Expounding upon this conclusion, Terry testified that they surprised the court, the prosecutor, and the jury by pleading guilty. He explained that they should have at least "pitch[ed] a fight."

When Brock Mahler was appointed as the third attorney in this case, he was employed as a staff attorney by the Capital Case Resource Center. He officially began working with the defense team in November although he had been consulted in October. Mahler testified that he initiated the investigation regarding mitigation evidence. Mahler testified that Susan Canon had been retained as the mitigation investigator in this case; specifically, she had been approved as of September 9th. Mahler explained, however, that it was not until the end of October when Mahler personally brought Canon to meet the appellant that an initial interview was conducted. A short time thereafter, Canon informed Mahler that she had to withdraw from the case. Ann Charvet was then contacted as a substitute for Canon. Although the mitigation investigator did spend roughly 77 hours preparing for this case, Mahler stated "[t]hat's laughable. Typically a mitigation investigation is in excess of 300 hours." Thus, as of November, nothing had been done on the appellant's case except that an evaluation by a mental health expert had been performed and the defense team had obtained some of the appellant's hospitalization records. Mahler testified that two months was not enough time to thoroughly prepare for trial. Although Mahler believed that they had a fairly compelling psychiatric explanation, they needed to introduce more law and expert witnesses to buttress their story before the jury. Mahler testified that, if he had more time, he would have involved Dr. Pamela Auble, who had evaluated the appellant, as a witness. He also mentioned that Dr. Ken Anchor, who had evaluated the appellant as a juvenile, should have been a witness, as he could have corroborated the fact that the appellant did show symptoms of a person with at least a sexual identity disorder. Mahler stated that a drug and alcohol expert was necessary as well as a social worker. Mahler admitted that motions for continuances were sought, but denied.

Regarding the penalty phase of the trial, Mahler testified that he was to deal with the psychiatric proof; Dawson was to deal with lay witnesses and direct examination; and Terry was to deal with cross-examination of the State's witnesses. Despite this plan, Mahler felt that the defense team was not integrated. Dawson and Terry were pulled from their private practices; so most of the work was done on the weekends. Mahler testified that he had urged Terry to be prepared to cross-examine Dr. Harlan, including "bon[ing] up on some medical treatises. . . ." Mahler opined that Terry "needed to inform himself about the medical aspects of ligature strangulation to be prepared to cross-examine Dr. Harlan." In fact, Mahler stated that an independent forensic pathologist should have been consulted to rebut Dr. Harlan's opinion regarding the length of time the victim remained conscious. Mahler attempted unsuccessfully to challenge Dr. Harlan's testimony in the motion for new trial. Indeed, Mahler testified that there was information to support the defense's position that consciousness could not have lasted as long as Dr. Harlan testified. Specifically, Mahler stated that there was an affidavit by Dr. Sperry stating that loss of consciousness would have been very rapid and there was testimony from another case where the defense had effectively cross-examined Dr. Harlan as to ligature strangulation.

Mahler took issue with the appellate court's opinion that the "heinous, atrocious, cruel" factor focused upon "mental torture because the victim was helpless." Mahler stated that he never got that impression. Rather, Mahler testified that he was of the opinion that "Mr. Bassett was involved in being robbed. One does not presume in the course of a robbery that one is going to be killed." He further criticized the Court of Criminal Appeals' opinion, concluding its findings inconsistent because Mr. Bassett had a pillow over his head and was in another room. Mahler noted that, given these facts, the victim would not have been able to overhear what the appellant and Brown were planning to do with him.

Mahler estimated that he spent about 500 hours on this case, including both trial and appeal preparation. Additionally, he testified that, in his opinion, Dawson and Terry's "performance was certainly deficient." He explained that they did not do anything on this case until "just near the end"; "[t]hey relied on [Mahler] to prepare this case for them."

Dr. Ann Charvet, a clinical sociologist, assisted defense counsel with the mitigation aspect of the case. Charvet testified that she began work on this case during the first week of December 1991. The trial began in January 1992. She was compensated for 77 hours worked on this case. Charvet admitted that she had submitted a supplementary invoice for an additional 75 hours, however, she was never compensated for this time. She stated that this was not sufficient time for her to perform her function as a mitigation investigator. Specifically, she explained that a major part of her investigation involved the compilation of various documents relating to the appellant's life and this aspect of the investigation is very time consuming.

In the present case, Charvet interviewed the primary witnesses, *i.e.*, the appellant's mother, stepfather, a brother, a sister-in-law, and some friends. Other primary witnesses, the appellant's brothers, were resistant to being interviewed. She was not successful in locating family members from the appellant's father's side of the family. Charvet testified that, had she had more time, she would have found secondary witnesses who could have "identif[ied] and validat[ed] the conditions in the home." Their testimony serves to make the testimony of the primary witnesses more credible. She explained that a lead attorney was not designated within the defense team. This resulted in confusion and, in her opinion, her information was not being properly utilized. She also felt restricted in her investigation. For example, she was not able to review all of the records the defense team had obtained prior to her involvement in the case. Had Dr. Charvet been provided either more time to prepare or additional financial resources, "[she] would have sought witnesses to tell a more complete story of who is Henry Hodges. [She] would have sought the humanization of him. [She] would have primarily tried to identify more clearly the conflict that he faced in coming to grips with his own sexuality." She testified that, had she been provided sufficient time, she would have interviewed counselors and mental health people and she would have interviewed prisoners with whom the appellant had been incarcerated.

David J. Keefe, chief counsel with the capital division of the Tennessee District Public Defender's Conference, reviewed the representation provided by counsel in the present case and testified on the appellant's behalf at the post-conviction hearing. Based on his review, Keefe opined that the appellant's attorneys were deficient in their representation of the appellant. He suggested

that the attorneys should not have accepted appointment unless they were able to devote all or a substantial portion of their time to the matter. He further opined that the attorneys should have designated one person to serve as lead counsel to lend direction to the preparation and trial of the case. According to Keefe, the appellant was prejudiced by counsel's lack of involvement early in the case when the appellant gave interviews to the media without first being consulted by counsel. The jury never heard these statements provided to the press, however, Keefe believed the appellant was prejudiced just the same because the lawyers may have made the decision to plead guilty in part due to the fact that these statements were potentially available for introduction at trial. Keefe also believed the decision to plead guilty was wrong and hastily made. He opined that, by pleading guilty, the defense team confused the jury and lost an array of appellate issues. Keefe further criticized the defense team as developing their sentencing theory backwards. Specifically, he stated that the defense team should have investigated the facts and the appellant's background before they came up with a psychological theory to tell the jury instead of trying to adopt a theory and then fill in the holes. He also emphasized the defense team's ineffectiveness by not attempting to rebut the State's theory that the victim remained conscious for three to five minutes during the strangulation.

Julie Hackenmiller, a mitigation specialist with Inquisitor, Inc., was retained by the appellant for the post-conviction proceeding. Hackenmiller was responsible for performing the social history and assessments on the appellant's case. Inquisitor, Inc. began collecting the appellant's records and locating witnesses in June 1998; by August 1998, Hackenmiller was given primary responsibility for the mitigation investigation. At the time of the post-conviction hearing, Hackenmiller stated that her investigation was not complete and she needed additional time to complete her social history and assessment of the appellant. Although she received the appellant's high school records, she had not yet received prison records from Georgia or Florida, despite making several requests. She stated that she requested that post-conviction counsel subpoena these records in August 1998. She further testified that she needed more time to interview one of the appellant's school principals regarding teasing by other students endured by the appellant.

Hackenmiller also identified other mitigation themes that were not explored during trial. Specifically, she related that the appellant's mother had an extremely abusive childhood and background. Both her father and her husband were extremely abusive. His mother, as well as other maternal family members, had been diagnosed as mentally ill. Specifically, the appellant's mother had previously suffered a "nervous breakdown," and "she has been diagnosed as bipolar and post-traumatic stress disorder." In furtherance of this avenue, Hackenmiller obtained a release from the appellant's mother for her medical records. Notwithstanding, she had not yet received the records as of the hearing date. Additionally, she discovered that the appellant had a great deal of trouble as a juvenile. He had a substance abuse problem and had an "extremely little social support system to turn to." In her attempt to contact members of the appellant's family, Hackenmiller was frustrated by the appellant's mother's endeavor to thwart the interviews. In essence, Hackenmiller stated that the family's attitude was "uncooperative." She attributed this to the "extreme abuse [experienced by the appellant and his family] by the members of the press." Despite the family's current position, Hackenmiller believes that she will be able to establish rapport with the mother so that she will eventually be able to interview the brothers.

Hackenmiller reported that the appellant's maternal grandfather, an alcoholic, was "an extremely violent, physically and sexually abusive individual." The appellant's mother was addicted to Valium, thus, the appellant had access to Valium and "sometimes overdosed or would take the Valium." Hackenmiller was less successful, however, in investigating the paternal side of the appellant's family. Specifically, she testified that she was still trying to identify five or six children from his father's legal marriage to another woman. In noting the relationship of the appellant's parents, Hackenmiller testified that the appellant's mother and father, although never married, spent seventeen years together.

Hackenmiller was in possession of records from various institutions where the appellant had been confined as a juvenile which indicated that the appellant responded well to positive reinforcement in an institutional setting. She referred to a report from a family therapy session when the appellant was twelve years old indicating that many of his problems derive from his home and parental situation. Another psychiatric report, also from 1979, indicated that the appellant was extremely motivated and performed very well in the therapeutic session. However, the report indicated that the appellant's home life was lacking in support and psychological warmth. Another report supported these conclusions, including that the appellant responded in a positive manner to praise and encouragement. These reports focused on the fact that the appellant required continuity between his teachers, parents and school authorities regarding his discipline. Hackenmiller reported that despite this advice, continuity in the home was not maintained. A discharge summary from the Parthenon Pavilion in 1981 indicated that the appellant had "moved home, switched school, and also had difficulty at home with his father being accused of a sexual relationship with his maternal aunt." This document also related that the appellant was responding well to treatment in a therapeutic environment. A 1981 report from the Wilder Youth Development Center reiterated that the appellant was doing extremely well in therapeutic environment and he was making excellent grades in school. A Madison Hospital admission in 1982 indicated that the appellant's behavioral problems included problems at school, home and with legal authorities. This document diagnosed the appellant with "adjustment disorder and passive-dependent personality." The document also indicated that the appellant's drug and alcohol usage was greatly influenced by his brothers and his peers. Another report indicated that the appellant associated with youths that got into trouble and that the appellant appeared to be a follower. A social history update from the Spencer Youth Center related that, within five months after the appellant's release from Wilder Youth Development Center, he had returned to using alcohol and drugs. A classification summary performed by the DeDe Wallace Center in 1982 provided that the appellant sought help in that he wished to end his "crime-drug cycle." None of this information was introduced at the penalty phase of the trial. The appellant's juvenile TDOC records listed indicators that the appellant was the victim of sexual abuse by other inmates and that the appellant attempted suicide and was placed on suicide watch. On cross-examination, Hackenmiller admitted that Dr. Nurcombe had access to all but the "Wilder" records, however, she rationalized that Dr. Nurcombe only covered the areas of mitigation import "minimally."

The State presented the testimony of Dr. Bruce Phillip Levy, Medical Examiner for Davidson County and Chief Medical Examiner for the State of Tennessee. Specifically, Dr. Levy was called to testify as to the time of death and the loss of consciousness in ligature strangulation cases. Dr.

Levy testified that there are three different mechanisms that can cause loss of consciousness during ligature strangulation: (1) compression of the airway itself; (2) compression of both the arteries and veins in the neck; and (3) occlusion of the veins in the neck. The former involves the most pressure and the latter involves the least pressure applied around the neck. Dr. Levy testified that consciousness would be lost, in the second instance, in about ten to twenty seconds and death would result in about four to five minutes. He stated, in this type of case, there would be no congestion of the face, no hemorrhaging in the eyes, and congestion in the chest below the ligature. In the third instance, unconsciousness would result in about 60 seconds, and death in about four to five minutes. Dr. Levy stated that, in this instance, there would be marked congestion of the face and hemorrhaging of the eyes. According to Dr. Levy, there has been dispute in the medical community for the previous ten years regarding the length of time someone would remain conscious during strangulation. He testified that in 1989 or 1990, the belief was that someone could remain conscious for as long as they could hold their breath, which could be up to a couple of minutes.

Dr. Levy stated that, regarding the present case, he reviewed the medical examiner's file, the testimony at the trial, and the deposition of Dr. Sperry providing an opinion as to the length of time that the victim would have remained conscious. After reviewing this evidence, Dr. Levy concluded that the victim died as a result of a ligature strangulation involving compression of both the veins and arteries as well as occlusion of the veins alone. Dr. Levy also opined that there could have been more than just one continual attempt to strangle the victim in this case. Given the trial testimony and other information, Dr. Levy believed it was possible that the victim could have remained conscious for longer than a minute or two. Dr. Levy further believed that the minimum length of time the victim remained conscious was forty to eighty seconds, assuming there was a constant occlusion of the veins. On cross-examination, given his review of the evidence in the case, Dr. Levy testified that he disagreed with Dr. Harlan's trial testimony that the victim remained conscious for three to five minutes.

## I. Ineffective Assistance of Counsel

The appellant contends that he was denied effective assistance of counsel due to (1) counsel's failure to investigate, identify and challenge the State's proof that the victim was conscious for three to five minutes during the ligature strangulation; (2) counsel's failure to challenge the fingerprint evidence; (3) counsel's hasty decision to enter a guilty plea; (4) the systemic deficiencies in the indigent defense system of the State of Tennessee; and (5) counsel's failure to conduct a competent mitigation investigation. Each of these contentions must be analyzed using the two-prong test established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), for deciding Sixth Amendment ineffective assistance of counsel claims:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive

-14-

the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. See also Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996).

To demonstrate that counsel's assistance was ineffective, "the defendant must overcome the presumption that under the circumstances the challenged action 'might be considered sound trial strategy' (citation omitted)," and show instead, that counsel's conduct did not comport with the "prevailing norms of practice" and thereby "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 689-90, 104 S.Ct. at 2064-66; Goad, 938 S.W.2d at 369.

[I]n assessing the prejudice from counsel's errors . . . [w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence - - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Strickland, 466 U.S. at 695, 104 S.Ct. at 2068-69; Goad, 938 S.W.2d at 370.

Additionally, this court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland v. Washington, 466 U.S. at 689-690, 104 S.Ct. at 2065-2066. Moreover, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114, 3121 (1987).

Before undertaking review of the appellant's specific allegations, we note that, in support of his claims of ineffective assistance of counsel, the appellant relies heavily upon counsel's admitted deficiencies in both their preparation and investigation prior to trial and their actual performance during the sentencing phase. Such concessions by counsel are not binding in our analysis. See State v. Holzemer, 541 N.W.2d 837 at fn 6 (Wis. 1995). In determining whether a defendant was deprived of constitutionally guaranteed effective counsel, this court determines whether the acts or omissions of counsel alleged by the defendant are unreasonable and ask whether some reasonable lawyer could have conducted the trial in that manner. See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000). Because the standard is an objective one, counsel's admissions at the post-conviction level are not determinative to this court's review. See generally Chandler, 218 F.3d at 1316; Tarver v. Hopper, 169 F.3d 710, 716 (11th Cir. 1999); Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir. 1992).

## A. Failure to Challenge Proof of Consciousness after Ligature Strangulation

-15-

Prior to trial, the State filed a response to the appellant's Motion for Bill of Particulars regarding the factual basis for establishing the "heinous, atrocious, cruel" aggravating circumstance. The response indicated that "the victim plead [sic] . . . for his life and the defendant strangled him. The victim would have been alive and conscious for 3 to 5 minutes prior to loss of consciousness as a result of the strangulation." Defense counsel was on notice that the State intended to call Dr. Harlan to prove the time frame for death by ligature strangulation and the length of time of consciousness prior to death. At trial, Dr. Harlan testified that the victim would have died within three to five minutes from the ligature strangulation and would have remained conscious during most of this period. Defense counsel did not challenge the time frame of consciousness on cross-examination.

The appellant challenges trial counsel's performance in attempting, or failing to attempt, to rebut the State's evidence regarding the length of time the victim remained conscious during the strangulation in this case. The appellant also claims that counsel was ineffective by failing to seek expert assistance to counter Dr. Harlan's trial testimony, by failing to adequately research relevant medical material on ligature strangulation, and by failing to timely discuss with Dr. Harlan his conclusions before trial. The appellant argues that the prejudice from counsel's performance resulted in the jury being misinformed about the actual length of time the victim could have remained conscious. Accordingly, the appellant states that this misinformation caused the jury to find the existence of the "heinous, atrocious, cruel" aggravating circumstance. Further, the appellant suggests that this was "the most weighed aggravating factor" of the three found by the jury in this case.

At the evidentiary hearing, Michael Terry testified that he was responsible for cross-examining Dr. Harlan at trial. He admitted that he did not question Dr. Harlan until immediately prior to trial, but explained that the defense team "didn't think that there was any issue about the cause of death." He admitted that he was unprepared. Notwithstanding, Terry was able to get Dr. Harlan to admit on cross-examination that the victim could have been conscious less than three minutes. Despite their lack of initial investigation, the defense team did present, at the motion for new trial, evidence attacking the veracity of Dr. Harlan's testimony.

Brock Mahler testified that, prior to trial, he had strongly urged Michael Terry to be prepared to cross-examine Dr. Harlan. He stated that a forensic pathologist was definitely needed for consultation regarding Dr. Harlan's opinion relating the length of time the victim remained conscious. Information disputing Dr. Harlan's opinion existed and was presented at the motion for new trial. Mahler further disagreed with the appellate court's characterization of the "heinous, atrocious, cruel" aggravator which focused on the helplessness of the victim. David Keefe was called as an expert witness regarding trial counsel's performance. He emphasized the defense team's ineffectiveness by not attempting to rebut the State's theory that the victim remained conscious for three to five minutes during the strangulation.

An affidavit of Dr. Kris Sperry was submitted to the court. The affidavit provided the following:

5. Based upon my review of these materials, it is my opinion that Ronald Allen Bassett died as the consequence of a ligature strangulation, when the rope as depicted in the photographs was wrapped extremely tightly around his neck. Both the photographs and the information in the autopsy indicate that this ligature was wrapped very tightly, to a degree that would quite readily restrict both the arterial blood flow to the brain and the venous return from the brain.

6. During the course of a ligature strangulation, when the venous blood return from the heart alone is impeded, an individual will lose consciousness in 20 to 30 seconds. When the pressure exerted on the neck is sufficient to also block the arterial flow to the brain, consciousness will be lost in 10 to 15 seconds. With either or both of these mechanisms, it is not possible for an individual to maintain consciousness for a period at or about three minutes.

7. During the course of his testimony, . . . Dr. Harlan states that "He would have remained conscious for the greater part of three to five minutes." In my opinion, to a reasonable degree of medical certainty . . . it was not possible for Mr. Bassett to have maintained consciousness for this extended period of time while being strangled in the manner depicted and described. Rather, the greatest probability is that he lost consciousness within no more than 20 to 30 seconds after the ligature was applied, and probably sooner. . . . Dr. Harlan's testimony grossly exaggerates the time that Mr. Bassett would have been able to maintain consciousness, far beyond what would be considered medically possible . . .

The appellant also presented the testimony of Dr. Harlan contained in the capital case, State v. Ronnie Cauthern, wherein Dr. Harlan stated that unconsciousness occurs in thirty seconds during ligature strangulation.

In rebuttal, the State presented the testimony of Dr. Bruce Phillip Levy. Dr. Levy opined that, in the instant case, it was possible that the victim could have remained conscious for longer than a minute or two. Dr. Levy admitted on cross-examination that he disagreed with Dr. Harlan's testimony. Indeed, Dr. Levy believed that the minimum length of time the victim could have remained conscious was forty to eighty seconds.

The post-conviction court noted, as evidenced by the testimony at the hearing, that, at the time of the appellant's trial, the popular belief was that consciousness was related to how long a person could hold his breath rather than the blood supply to the brain. This opinion has since changed to the common position that once the blood supply to the brain is cut by strangulation then unconsciousness results. Accordingly, the post-conviction court refused to find the failure to further challenge Dr. Harlan's testimony ineffective. Additionally, the court noted that, since the finding of the "heinous, atrocious, cruel" circumstance was based on a number of factors, not just the length of the victim's consciousness, even if counsel's performance was deficient, it was not prejudicial. Although we find deficient counsel's performance in failing to fully investigate and challenge the

State's proof that the victim was conscious for three to five minutes during the ligature strangulation, we agree with the post-conviction court that no prejudice enured to the appellant's detriment.

The jury imposed a sentence of death, finding the presence of three statutory aggravating circumstances, *i.e.*, (1) the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person; (2) the murder was especially "heinous, atrocious or cruel" in that it involved torture or serious physical abuse beyond that necessary to produce death; and (3) the murder was committed while the defendant was engaged in committing a robbery. See Hodges, 944 S.W.2d at 351 (citing Tenn. Code Ann. § 39-13-204(i)(2); (i)(5); and (i)(7) (1991)). On direct appeal, our supreme court found the proof sufficient to establish the presence of these aggravating circumstances. See Hodges, 944 S.W.2d at 357-358. Specifically, in finding the evidence sufficient to support application of the "heinous, atrocious, cruel" aggravating circumstance, our supreme court found, "[t]he proof introduced by the State during the trial clearly established torture." Hodges, 944 S.W.2d at 357 (*footnote omitted*).

> Hodges handcuffed the victim, bound his feet with duct tape and left the victim lying on the bed with a pillow over his head. No doubt, the victim suffered considerable mental pain as the appellant, along with Trina Brown, ransacked his home, looking for valuable property and money. The helpless victim's mental pain, no doubt, increased when the appellant and Brown, took a break, and over a coke, discussed whether or not they should kill the victim. The evidence surrounding the murder itself shows that the victim pleaded with Hodges for his life. *Dr. Harlan testified that the killing would have taken between three to five minutes to accomplish and that [the] victim would have been conscious during most of this period.* Brown testified that she heard the victim moaning and making a choking sound. The facts and circumstances surrounding this murder, including the strangulation, are clearly sufficient to establish torture. . . .

Hodges, 944 S.W.2d at 357-358 (emphasis added). Indeed, the testimony regarding the length of time of the victim's consciousness was only one factor in establishing "torture." See State v. Henry Eugene Hodges, No. 01C01-9212-CR-00382 (Tenn. Crim. App. at Jackson, May 18, 1995), aff'd by, 944 S.W.2d 346 (Tenn. 1997) ("[s]trangulation alone does not establish the heinous, atrocious and cruel aggravating factor."). Thus, even had defense counsel established that the length of the victim's consciousness was only twenty to thirty seconds, ample evidence still remained from which the jury could have found the "heinous, atrocious, cruel" aggravating circumstance. Accordingly, the appellant has failed to establish prejudice resulting from counsel's deficient conduct.

### B. Failure to Challenge Fingerprint Evidence

The appellant contends that counsel was ineffective by failing to seek an independent fingerprint examiner to review the conclusions drawn by the State's examiners, failing to evaluate the procedures used to lift and preserve the latent print, and failing to identify or eliminate unknown

latent prints found in the victim's residence. The appellant further claims that he was precluded from demonstrating prejudice due to the post-conviction court's denial of funds for a fingerprint expert.

This claim focuses upon a latent fingerprint lifted from a unicorn glass globe found in the victim's residence. A latent fingerprint examiner employed by the Metro Police Department examined the latent print and compared this print to known prints of the appellant. The prints were identified as those of the appellant. Trial counsel did not have an independent fingerprint expert review the conclusions drawn by the State's examiners nor did they challenge the procedures used to lift and preserve the latent print.

The post-conviction court denied post-conviction counsel's motion for funds for a fingerprint expert. Thus, no testimony was presented to explain the failure to request a fingerprint expert. Notwithstanding, given the nature of the case, we presume a threshold finding of deficient performance regarding counsel's failure to investigate the State's expert's findings. However, the appellant has not demonstrated how he was harmed by counsel's failure to request the services of independent experts. See Black, 794 S.W.2d at 757. As noted by the post-conviction court in its denial of funds, the qualifications of the State's experts were not challenged and there is no allegation of bias. See infra.

What is more important, however, is the effect of the appellant's guilty plea. Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In other words, although some pre-plea action or inaction of counsel may have been deficient, in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 370 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997) The appellant has failed to show how such an attack on the fingerprint evidence would have altered his decision to plead guilty. The proof does show, however, the overwhelming evidence of the appellant's guilt irregardless of the fingerprint evidence. Indeed, the appellant publicly confessed to the murder; personal property of the victim was found in the appellant's possession at the time of his arrest; and the appellant's girlfriend, Trina Brown, had been video-taped withdrawing money with the victim's automated teller card. Given the quantity of the inculpatory evidence, we cannot conclude, even had counsel been successful in challenging the fingerprint evidence, that the appellant would not have made the decision to plead guilty. Moreover, the mere fact that the State relies upon expert evidence does not mean that an indigent accused is entitled to an expert unless the failure to provide expert services amounts to a denial of due process. See State v. Phillips, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986). Accordingly, the appellant has failed to meet his burden of establishing that counsel's failure to request a fingerprint expert prejudiced the outcome of his trial. This claim is without merit.

### C. Hasty Decision to Enter Guilty Plea

After voir dire of the jury for the guilt phase of the trial, the appellant abandoned his plea of "not guilty," and entered a plea of guilty to all counts charged against him, "making him

immediately death eligible." The appellant claims that trial counsel were ineffective by deciding to plead guilty rather than proceed to trial. He maintains that the advice constituted deficient legal representation that resulted in severe prejudice. Additionally, he contends that the "hasty" decision to enter the plea effectively "destroyed their credibility with the jury." He argues that the decision was made absent (1) any consideration of the pros and cons of pleading guilty; (2) any research into the ramifications of pleading guilty in a capital case; and (3) any consultation with third party attorneys on the matter.

At the post-conviction hearing, Dawson testified that the decision to enter a guilty plea was made the weekend prior to trial when it was determined that "there was no way we were going to convince anybody that Mr. Hodges didn't kill the victim in this matter." He explained that, at that time, the defense team believed that by entering a plea during the guilt phase of the trial, they would gain credibility with the jury for the sentencing phase. The defense team also hoped to surprise the State by entering the plea. In essence, the defense team intended to disrupt the bifurcated nature of the trial, thereby precluding the State from introducing evidence during the penalty phase which the State had planned to introduce at the guilt phase. Notwithstanding this reasoning, Dawson admitted that, although the proof was overwhelming, in hindsight, they should have proceeded to trial so that they could have begun introduction of their mitigation theories. Michael Terry corroborated Dawson's testimony regarding the appellant's guilty plea. He explained that the plea was supposed to be "a demonstration of remorse for the jury." However, he agrees that the decision was a mistake and that they should have at a least "pitched a fight." The appellant did not testify at the post-conviction hearing. Other than his attorneys protestations of ineffectiveness at this level, there is no other evidence that the appellant's guilty plea was not knowingly entered. The post-conviction court concluded that counsel made an informed tactical decision in advising the appellant to enter the guilty plea.

While law and tradition allocate to counsel the right to make binding decisions of trial strategy in many areas, see Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525 (1975), the accused retains the ultimate authority to make certain fundamental decisions regarding the case. The decision to plead guilty or not guilty is a matter reserved solely for the accused. See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. . . ."). Indeed, the gravity of the consequences of a decision to plead guilty or to admit one's guilt demands that the decision remain in the defendant's hand. A lawyer may make a tactical determination of how to run a trial, but the due process clause does not permit the attorney to enter a guilty plea without the client's consent. See Brookhart v. Janis, 384 U.S. 1, 8, 86 S.Ct. 1245, 1249 (1966) (Harlan, J., concurring). In sum, the decision to plea guilty belongs to the accused, not the attorney.

A plea of guilty should not be accepted unless it appears that the plea is freely and voluntarily entered by the accused. See Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463 (1970); Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709 (1969); Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The constitutional validity of a guilty plea made upon the advice of counsel depends upon whether counsel's performance was reasonably competent, rendering the defendant effective

representation during the particular proceedings. If the pleas were made in reasonable reliance upon the advice or representation of counsel, which advice or representation demonstrated incompetence, then it can be said that the defendant's pleas were not voluntary.[9]

The two-prong <u>Strickland</u> standard for determining ineffective assistance of counsel is applicable to ineffective assistance claims arising out of guilty plea proceedings. <u>Hill v. Lockhart</u>, 474 U.S. 52, 57, 106 S.Ct. 366, 369-70 (1985). To satisfy the first prong, the appellant must establish that counsel's advice fell below an objective standard of reasonableness. <u>See generally</u> <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975); <u>Walton v. State</u>, 966 S.W.2d 54, 54-55 (Tenn. Crim. App. 1997). In order to satisfy the "prejudice" prong, the appellant must prove that, "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. at 59, 106 S.Ct. at 370; <u>Walton</u>, 966 S.W.2d at 55.

> In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by the courts reviewing ineffective assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

<u>Hill v. Lockhart</u>, 474 U.S. at 59, 106 S.Ct. at 370-371. In considering whether defense counsel was incompetent in advising the appellant to plead guilty, we must "eliminate the distorting effects of hindsight, . . . and . . . evaluate the conduct from counsel's perspective at the time." <u>Strickland v. Washington</u>, 466 U.S. at 689, 104 S.Ct. at 2065. We also must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. <u>Strickland v. Washington</u>, 466 U.S. at 689, 104 S.Ct. at 2065.

Although it is true that the appellant ultimately gained nothing by pleading guilty, the record persuasively demonstrates that the appellant had little to gain by insisting upon a trial. It is undisputed that the evidence against the appellant was overwhelming and that his chances of

---

[9] Of course, a defendant may enter a plea of guilty because of some erroneous advice of counsel; however, this fact alone does not defeat the voluntary nature of the plea. Whether a plea of guilty is unintelligent and vulnerable depends not on whether a court would retrospectively consider counsel's advice to be right or wrong, but whether that advice was within the range of competence demanded of attorneys in criminal cases. <u>McMann v. Richardson</u>, 397 U.S. 759, 770-71, 90 S.Ct. 1441, 1448-49 (1970). A plea based on reasonably competent advice is an intelligent plea not open to attack on the grounds that counsel erred in his judgment. <u>Id.</u>

-21-

acquittal were virtually non-existent. Indeed, in advising the appellant, defense counsel was faced with two options: plead not guilty to the indictment and face a full trial; or plead guilty to the indictment and face limited evidence in a sentencing hearing with an opportunity to trade on his acceptance of his guilt and remorse. Confronted with the overwhelming evidence of the appellant's guilt, defense counsel advised the appellant to plead guilty in the reasonable hope of obtaining leniency during the sentencing phase. Defense counsel reasonably believed that the jury would view the appellant's guilty plea as an expression of remorse warranting a less severe sentence than that imposed upon a defendant who protests his innocence in the face of overwhelming evidence of guilt. Moreover, by pleading guilty, the appellant eliminated the presentation to the jury of all of the evidence available to establish the appellant's guilt of the murder. The hard callous facts behind the offenses, in essence, were desensitized by avoiding the guilt phase. The absence of an in-depth recitation of facts enabled the appellant to seek some sympathy from the jury in the face of mitigating evidence.

Viewing from counsel's perspective at the time the advice was rendered to the appellant regarding the decision to plead guilty, we must reject the claim that such advice was outside the range of competence demanded of attorneys in criminal cases. The Supreme Court has recognized that the expectation or hope of a lesser sentence or the convincing nature of the evidence against the accused are considerations that might suggest the advisability of a guilty plea. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392 (1976); see also Brady v. United States, 397 U.S. at 742, 90 S.Ct. at 1463. Counsel, in the present case, made a tactical decision that a guilty plea was in the appellant's best interest and advised the appellant accordingly. The defense strategy was to avoid the death sentence. Trial tactics which arise from a matter of defense strategy will not support a claim of ineffective assistance. An informed strategic choice of counsel is virtually unchallengeable. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Although defense counsel's strategy for avoiding the death penalty was thwarted, the decision to pursue that particular strategy cannot be deemed incompetent. Given the overwhelming evidence of guilt, the advice of counsel regarding the appellant's decision to plead guilty cannot be faulted in hindsight. The courts must exercise substantial restraint before interfering with the attorney-client relationship and the matter of strategy and tactics. See Holland v. State, 761 S.W.2d 307, 320 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1560 (1989) (citation omitted). Such an inquiry should only be made where it does not appear that there exists any plausible basis in strategy and tactics for the particular act or acts by counsel. Id. Errors in trial strategy do not generally establish incompetence. Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065; see also McMann v. Richardson, 397 U.S. at 770, 90 S.Ct. at 1448 ("that a guilty plea must be intelligently made is not a requirement that all advice offered by defendant's lawyer withstand retrospective examination in a post-conviction hearing."). Moreover, we acknowledge that a defendant is entitled to competent, not perfect, representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Accordingly, after review of the record, we cannot conclude that counsel's recommendation to the appellant to plead guilty constituted incompetent advice. This issue is without merit.

**D. Inherent Ineffectiveness based upon Tennessee's Indigent Defense System**

The appellant next claims that the systemic deficiencies in the indigent defense system of the State of Tennessee render any indigent capital defendant's Sixth Amendment right to effective counsel a nullity because it forces the court-appointed attorney to choose between the defendant's right to effective representation and the attorney's right to earn a living. In other words, he asserts that the fee structure afforded counsel for indigent capital defendants in this state necessarily denies him effective representation by counsel due to counsel's lack of devotion to his case. Particularly, the appellant supports his claim by referencing counsel's lack of involvement in his case upon initial appointment. Indeed, he asserts that had counsel maintained more contact with the appellant upon their appointment, they could have prevented him from making inculpatory statements to the media and they could have further investigated his case. He explains that had counsel received greater compensation, they would have been willing to devote more time to his case.

The appellant's claim that the court-appointed compensation scheme created a financial disincentive to provide competent, quality representation in this case is belied by the record. By their own account, each attorney expended more than 300 hours on the case. The hired investigator/mitigation expert spent at least 150 hours on the case. In reviewing the appellant's claim that earlier intervention by counsel would have prevented him from giving inculpatory interviews with the media, the post-conviction court found that

> [t]he petitioner is a person who craves attention. Even after his return to Nashville and conferring with counsel he continued to write letters and give interviews. There is no proof that earlier intervention by counsel would have prevented the petitioner from making these inculpatory disclosures to the press or government officials.

The court further discounted any inherent ineffectiveness resulting from the compensatory schedule of appointed counsel for capital indigent defendants, finding:

> . . . [g]iven the amount of time spent by counsel in preparation for the 1992 trial, this could not be the case. There is no proof in this record that if trial counsel had been paid more, that they would have done more. The testimony on this issue was amorphous and vague. Sure, counsel would have liked to be paid more, but the fee structure did not deprive this petitioner of effective representation. See Johnson v. State, 693 N.E.2d 941, 952-953 (Ind. 1998) (counsel not deficient even though at post-conviction hearing he said that if paid more he might have been able to do more). See also Bui v. State, 717 So.2d 6, 15-16 (Ala. Crim. App. 1997).

The record does not preponderate against the post-conviction court's findings. We conclude that the appellant has failed to establish by clear and convincing evidence that counsel could have prevented him from giving inculpatory interviews with the media. Nor has the appellant established that counsel failed to devote time to the appellant's case due to the fee schedule for counsel appointed to indigent defendants in capital cases.

In making our decision, we are fully cognizant of the legal profession's traditional and historic role in society. The practice of law is not a marketplace business or commercial venture but,

rather, a profession dedicated primarily to service. See Bailey v. State, 424 S.E.2d 503, 504 (S.C. 1992), reh'g denied, (1993). Upon admittance to practice in this state, attorneys accept the aspirational objective that part of one's professional obligation is that "every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." See Tenn. Sup. Ct. R. 8, E-C 1-1. Accordingly, attorneys are encouraged to participate in *pro bono* work. See generally Tenn. Sup. Ct. R. 8, E-C 2-1; E-C 2-16; E-C 2-25. Indeed, "the rendition of free legal services to those unable to pay reasonable fees continues to be an obligation of each lawyer. . . ." Tenn. Sup. Ct. R. 8, E-C 2-25. Thus, even though a *"pro bono,"* or, as in this case, an appointed case, may cause personal financial hardship to counsel, counsel should not seek to be excused from undertaking the representation except for compelling reasons. See Tenn. Sup. Ct. R. 8, E-C 2-29. Once appointed to represent an indigent defendant, counsel is obliged to competently handle the matter, including adequate preparation of the case. See Tenn. Sup. Ct. R. 8, DR 6-101. Additionally, counsel must undertake zealous representation of his or her indigent client within the bounds of the law. See Tenn. Sup. Ct. R. 8, DR 7-101; DR 7-102.

Under Strickland v. Washington, an aggrieved defendant must demonstrate actual substandard performance and prejudice by counsel. A blanket claim that the fee schedule established for counsel appointed in indigent capital defendant cases in Tennessee does not suffice to meet the burden. Thus, we decline to hold that the out-of-court fee schedule applied to private attorneys appointed to represent indigent capital defendants necessarily renders any representation ineffective because of the financial burden on counsel.[10] See generally Ex parte Darrell Grayson, 479 So.2d 75 (Ala. 1985) (statutory compensation of counsel for indigent defendant is not unconstitutional); People v. District Court of El Paso County, 761 P.2d 206 (Colo. 1988) (*en banc*) (limitation on fees paid to appointed counsel do not *per se* deprive defendant of effective assistance of counsel); People v. Johnson, 463 N.W.2d 171 (Mich. App. 1990) (fixed fee schedule for assigned counsel does not violate indigent defendants' rights to counsel); Webb v. Commonwealth, 528 S.E.2d 138 (Va. 2000) (fee schedule for appointed counsel is not so inadequate as to violate the Sixth or Fourteenth Amendments). But see Arnold v. Kemp, 813 S.W.2d 770 (1991) (statutory cap on attorney's fees for indigent capital defendant unconstitutional); State v. Lynch, 769 P.2d 816 (Okla. 1990) (*same*); Bailey, 424 S.E.2d at 503 (*same*). Moreover, the claims of specific incompetence and negligence alleged by the appellant and its resultant prejudice are not supported by the record. This claim is without merit.

### E. Failure to properly conduct mitigation investigation

The appellant claims that trial counsel was ineffective "by failing to conduct a reasonable and competent mitigation investigation, by usurping the function of specialized experts in this area, by focusing upon a mitigation theory which was neither investigated nor corroborated, and by ignoring, overlooking or unjustifiably rejecting significant evidence of mitigation which was never pursued and never presented to the jury." Specifically, he contends that, in the absence of a sufficient

---

[10] No statutory cap on compensation for representation of an indigent capital defendant exists in Tennessee. See Tenn. Sup. Ct. R. 13 § 3(j). Rather, counsel is to be compensated on an hourly basis. Id.

mitigation investigation, the appellant "was defined to the jury by the worst times of his life, not in the broader context where he would be reflected in a more positive and more sympathetic light than the crime depicted."

The mitigation theory adopted by the defense team focused upon a self-reported homosexual rape occurring when the appellant was twelve years old. He contends that counsel failed to obtain pertinent records, including prison, medical, educational and parole records, which would have reflected mitigation themes contrary to that asserted by defense counsel. The appellant also asserts that counsel failed to locate numerous lay witnesses, such as friends, teachers, classmates, co-workers, juvenile authorities, and jail personnel to testify regarding the appellant's life and experiences. In sum, the appellant defines counsel's last minute effort at a meaningful mitigation investigation as a "helter skelter intense effort to prepare a case for trial in two months," which made it "absolutely impossible to present a coherent, much less, credible presentation to the jury to spare the life of Henry Hodges." Indeed, he asserts that counsel's premature commitment to an unverified and uninvestigated mitigation theme, *i.e.* isolated homosexual rape, caused defense counsel to reject, ignore, or overlook powerful mitigation evidence which opened up numerous avenues to defend the appellant against death. Additionally, the appellant contends that, had counsel performed an adequate investigation, the following positive themes could have been presented to the jury: (1) the appellant was "starved for positive reinforcement and wanted to please his elders when he was twelve years old;" (2) the appellant was "extremely motivated and performed very well" in a structured environment; (3) the appellant "responded well to praise and encouragement;" and (4) the appellant was a "follower" and susceptible to outside influence.

> The post-conviction court made the following findings and conclusions regarding this claim:
> [A]ppellant now contends that perhaps a psychologist and a psychological examiner should have been called, but they were not called at the January 1999 hearing. Perhaps there was more family history that could be helpful or school records or neighbors, but none were called at the January 1999 hearing. The only new information presented were some records from a juvenile institution but these were cumulative to information presented at trial in 1992.
>
> The [appellant] with an ineffective assistance of counsel claim must not only allege prejudice, but must prove prejudice by competent evidence. If the [appellant] says his lawyer failed to put on certain evidence, the [appellant] must produce that evidence, to not only show the fact finder that the evidence is producible, but that the evidence would have been helpful. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so that the trial judge can properly evaluate the evidence or the witness. See Black v. State, 794 S.W.2d 752 (Tenn. Crim. App. 1990); see also Brown v. McGinnis, 922 F.2d 425 (7th Cir. 1991) and Goode v. Armentrout, 925 F.2d 239 (8th Cir. 1991).

Here, the defense had a theory of mitigation in the 1992 trial. This centered around the sexual abuse of the [appellant] when he was twelve. The defense presented evidence that the killing at issue in this case was motivated by a subconscious desire for revenge for the sexual abuse inflicted upon him and for rage at the discovery by his family of his homosexuality. This theory was supported by the testimony of Dr. Barry Nurcombe who is the head of Child Psychiatry at Vanderbilt Medical School. Dr. Nurcombe was an impressive witness. He was not a professional witness and seldom testified in court. He was well versed in the [appellant's] prior background, and well articulated the defense theory. At trial, Dr. Nurcombe explained:

> I had available to me extensive documentation concerning [appellant's] school record, his legal record, his mental health record. I also had available to me extensive investigation done by a private investigation group concerning his family background and early development. I have interviewed [appellant] for nine hours on three -- a total of nine hours on three separate occasions. I also had a telephone interview with [appellant] which lasted approximately one hour. I had access to five separate psychological testings of this man, beginning at the age of twelve and continuing through late adolescence.

This theory was further supported by the lay witnesses including the [appellant's] mother who testified at the sentencing hearing.

The Court recognizes the ease in which a lawyer who analyzes a case in hindsight will find that the tactics used by an unsuccessful trial lawyer were erroneous. It is easy after the fact to conclude that the wrong tactic was used and another strategy might have been more successful. Just like a football coach who calls an unsuccessful play as time runs out or the General who attacks too late in the day and loses the battle; it's always said that "he should have done something else." This is a temptation that the Court must resist. The tactics and decisions made by trial counsel in this case were in all respects reasonable at the time they were made.

The Court concludes that the [appellant] was not denied effective assistance of counsel at the sentencing hearing. His trial counsel investigated his background, presented the jury with evidence regarding the [appellant's] background, and supported this by a well-qualified expert witness. . . .

Because the appellant has failed to include the transcript of the sentencing hearing in the record before this court, the summary of the trial testimony provided by this court on direct appeal is helpful in assessing the allegation of inadequate investigation. At the sentencing phase,

> [t]he appellant presented evidence to mitigate his punishment for this murder. He presented evidence of his childhood, his family life, the sexual abuse he suffered

when he was twelve years of age, his mental illness or disturbance, [Trina] Brown's alleged dominance of him, his immaturity, and his drug abuse.

The appellant's mother and father maintained a "common law" marriage that lasted eighteen years. The appellant and one brother were born to this relationship. The appellant's mother was the victim of severe spouse abuse during the relationship.

According to family members, the appellant was his father's favorite. The appellant was never punished while his brother and two half-brothers were the subject of harsh punishment. If the appellant's mother punished him, his father would become angry at her. The appellant's mother and half-brother described the appellant as "spoiled." The half-brother stated that the appellant could do whatever he desired without fear of punishment.

The record reveals that the appellant lived a normal life until he was twelve years of age. When he reached this age, he refused to go to school, began to associate with older men, and started sniffing glue – anything that would make him "high." He frequently ran away from home and occasionally would stay away for weeks before returning home. Although the appellant's mother moved the family frequently, the appellant's lifestyle did not change. He was in custody of juvenile authorities on sixteen different occasions. While confined to a juvenile treatment facility in Chattanooga, the appellant escaped. He subsequently committed several serious offenses, which resulted in his convictions for robbery with a deadly weapon, simple robbery, and an attempt to commit a felony kidnapping.

The appellant's maternal grandfather was an alcoholic. One of the appellant's half-brothers is a recovering alcoholic. The appellant has a history of abusing marijuana. He smoked as many as eight marijuana cigarettes in a twenty-four-hour period.

The appellant testified that he was sexually abused by a complete stranger when he was twelve years of age. However, he never revealed this abuse to any member of his family. Nor did he tell the juvenile authorities or the Tennessee prison officials that he had been sexually abused. The sexual abuse did not surface until he had been arrested for the Fulton County, Georgia murder. He related this to an official at the Georgia Diagnostic Center. The appellant refused to tell his parents about the sexual abuse because his father was homophobic and the appellant felt his mother would blame him for the occurrence. He did not tell the juvenile authorities because he knew they would tell his mother.

Shortly after the sexual abuse incident, the appellant made his brother perform fellatio on him. He took a young female cousin into a closet for the purpose of engaging in sexual conduct. When the murder occurred, he was living with Trina Brown. He was also engaging in homosexual male prostitution.

The appellant's mother opined that fifteen-year-old Trina Brown completely dominated the appellant. Trina Brown testified that the appellant did not want to kill the victim and that it was she, not the appellant, who made the decision to kill the victim. She was afraid that if the victim was permitted to live, he would have the appellant arrested, and as a result, she would lose the appellant. Therefore, she told the appellant to kill the victim. The appellant admitted on cross-examination that both he and Brown tried to manipulate each other. He admitted that he had previously stated that Brown "would jump off a building" if he asked her.

Dr. Barry Nurcombe, a child psychiatrist, testified as an expert for the defense. He described the appellant as having an antisocial personality disorder. He outlined the appellant's family life, his childhood, the incident involving sexual abuse, his drug dependance, the murder, his relationship with Brown, his difficulty coping with stress, his poor judgment, which was aggravated by the use of marijuana, and other facts prior to expressing his professional opinion. He concluded that the appellant had a low self-esteem. He also concluded that although a grown man, the appellant reacts the same as a seven or eight-year-old child. He found that the appellant had established the rudiments of psychological disturbance prior to the incident involving sexual abuse.

According to Dr. Nurcombe, the appellant wanted revenge for the sexual abuse that he encountered in his childhood; and he viewed homosexuals as a class rather than individuals. Nurcombe related that Brown had told the appellant's sister-in-law the appellant was a homosexual. This was related by the sister-in-law to the appellant's half-brother, who confronted the appellant with this fact. Dr. Nurcombe opined that the stress resulting from this incident, coupled with the fact that the appellant's family might discover his homosexual lifestyle, motivated the appellant to kill the victim, – the next homosexual that propositioned him.

The appellant told Dr. Nurcombe that "he did not wish to be thought [of as] crazy, that he felt that he did things deliberately [on the night in question, and] that any attempt to explain what he had done on psychological grounds was hogwash."
. . .

State v. Henry Eugene Hodges, No. 01C01-9212-CR-00382.

Although our supreme court has observed that there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial, State v. Melson, 772 S.W.2d 417, 421 (Tenn. Crim. App.), cert. denied, 493 U.S. 874, 110 S.Ct. 211 (1989), we are cognizant of the fact that the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Thus, although there is no requirement that defense counsel present mitigating evidence in the sentencing phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilty and the sentencing phases.

Goad, 938 S.W.2d at 369- 370 (citations omitted), and, before selecting a strategy at sentencing, counsel must conduct a reasonable investigation into the appellant's background for mitigation evidence to use at sentencing. See Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir.), reh'g denied, (1995) (*en banc*), cert. denied, 516 U.S. 946, 116 S.Ct. 385 (1995).

In preserving defendants' rights to the effective assistance of counsel, courts are particularly cautious of the right in the context of a capital sentencing hearing. Goad, 938 S.W.2d at 369 (citing Deutscher v. Whitley, 884 F.2d 1152, 1160 (9th Cir. 1989); Cooper v. State, 847 S.W.2d at 529). A sentence of death must be based upon consideration of specific relevant aspects of the character and record of each defendant. Id. (citing Woodson v. North Carolina, 428 U.S. 280, 303, 96 S.Ct. 2978, 2991 (1976)). Thus, mitigating evidence relating for example to a defendant's emotional or mental problems or dysfunctional family background may render that defendant less culpable than the defendant who has no such background. Zagorski v. State, 983 S.W.2d 654, 658 (Tenn. 1998); Goad, 938 S.W.2d at 369 (citing California v. Brown, 479 U.S. 538, 544, 107 S.Ct. 837, 841 (1987)). Accordingly, although there is no requirement that counsel present mitigating evidence in the penalty phase of a capital trial, counsel does have the obligation to investigate and prepare for the penalty phase. Goad, 938 S.W.2d at 370 (citing Melson, 772 S.W.2d at 421; see Bertolotti v. Dugger, 883 F.2d 1503, 1516 (11th Cir. 1989) (parenthetical omitted); Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989), cert. denied sub nom, Kubat v. Greer, 493 U.S. 874, 110 S.Ct. 206 (1989) (parenthetical omitted)).

In Goad v. State, our supreme court set forth several relevant factors in determining whether counsel's failure to present mitigating evidence during the penalty phase resulted in prejudice to the defendant. Goad, 938 S.W.2d at 371.

(1) The court must analyze the nature and extent of the mitigating evidence that was available but not presented. Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d at 532; Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1995);

(2) The court must determine whether substantially similar evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d at 1092; Melson, 772 S.W.2d at 421.

(3) The court must determine whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).

Goad, 938 S.W.2d at 371.

Under the standard set forth in Goad, we conclude that the appellant has not presented any evidence at the post-conviction hearing substantially different from that proof introduced during the

penalty phase. The mitigation specialist retained for post-conviction purposes admitted that Dr. Nurcombe had access to the same records that she had, save one. "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Strickland v. Washington, 466 U.S. at 691, 104 S.Ct. at 2066. Considering the evidence before this court, we conclude that additional evidence from further mitigation investigation would be merely cumulative to that evidence obtained by trial counsel prior to the sentencing hearing. The appellant suggests that trial counsel should have presented this information in a different manner. This allegation is misplaced; counsel cannot be deemed ineffective merely because a different procedure or strategy might have produced a different result. Given the records presently before this court, we conclude that trial counsel adequately investigated the appellant's background and presented a case in mitigation that was supported by the information introduced. This claim is without merit.

## II. Denial of Funds for Expert Services

The appellant claims that the post-conviction court erroneously denied him funds for a drug and alcohol expert, a fingerprint expert, and a mitigation specialist. In seeking funds for support services, the appellant properly followed the procedural guidelines set forth in Tenn. Sup. Ct. R. 13(2)(B)(10). In his *ex parte* motion, the appellant claimed that the drug and alcohol expert was necessary to explain to the post-conviction court how the appellant's drug and alcohol addiction attributed to the crime and how the appellant's genetically predisposed addiction affected the appellant's personality and behavior. The mitigation specialist was requested in order to compile the psycho-social history of the appellant, to develop mitigation theories and to identify relevant forensic experts to assist in mitigation. The fingerprint expert was requested to perform an independent fingerprint examination.

On May 27, 1998, an *ex parte* hearing was held in response to the appellant's request for expert services. At the hearing, the appellant requested funds in the amount of $500 for Dr. Larry Miller, a fingerprint expert; $4,000 for Dr. Chris Sperry, a forensic pathologist; and $10,000 for Inquisitor, Inc., a firm that investigates and formulates mitigation evidence. On June 1, 1998, the post-conviction court authorized $500 for the services of Dr. Sperry and $10,000 for the services of Inquisitor, Inc. However, the court denied the appellant's request for funds for a fingerprint expert. In denying the funds for the fingerprint expert, the post-conviction court concluded:

> . . .[T]his fingerprint evidence is just pretty cut and dry . . . [in] United States v. [Scheffer], 118 S.Ct. 1261, . . . one dissenting justice, Justice Stevens, discussed an interesting study . . . [a]nd it found fingerprint evidence to be 100 percent accurate. . . . [U]nless there is some indication about the integrity of the fingerprint expert . . . this would just be a waste of money.

Subsequently, a second *ex parte* hearing was held on October 16, 1998, wherein the appellant requested an additional $7500 for mitigation services; the court, on November 19, 1998, authorized $5,000 for mitigation services. After another request by the appellant, a third *ex parte* hearing was held on January 8, 1999, at which time the appellant requested three additional experts. Specifically, he requested $3,650 for the services of Dr. Robert Kessler, a radiologist; $3,750 for the services of Dr. Murray Smith, a drug and alcohol expert; and $8,500 for the services of Dr. Lee Norton, a mitigation specialist. Although the post-conviction court granted the funding for the services of Dr. Robert Kessler, the court concluded that the appellant was not entitled to the services of the drug and alcohol expert and was not entitled to additional mitigation investigation. The court concluded:

> I'm going to deny the mitigation specialist and the drug and alcohol addiction expert. Now let me tell you about the drug and alcohol addiction expert. I mean, I don't - - I don't discount the possible importance of that. But, again, sort of back to the same thing I would say about the mitigation specialist; I do believe that we judges and lawyers are sufficiently knowledgeable to take that information and process it.
>
> In other words, I don't think just because you don't have an expert in your post-conviction hearing - - I mean, if you actually came up with the raw materials that prior counsel didn't find, I don't think you're precluded or even prejudiced in making the argument, well, Judge, if these raw materials were available and it was given to an expert we could have presented the expert to the jury.
> . . .
> And you all are smart enough to make this argument, Judge, if we'd known it, we could have gotten an expert who could have put this kind of spin on it. And I think I could process that and make a judgment about that without actually having the [expert] out there to tell me that.

Pursuant to Tenn. Code Ann. § 40-14-207(b), "[i]n capital cases where the defendant has been found to be indigent . . . , [the] court . . . may, in its **discretion**, determine that investigative or expert services are necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Code Ann. § 40-14-207(b)(1997) (emphasis added). Our supreme court has found that this section is applicable in post-conviction proceedings for capital defendants. Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995). In Owens, the supreme court held that a motion for services should be granted if, at the *ex parte* hearing, the petitioner demonstrates by "specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and the petitioner is unable to establish that ground for post-conviction relief by other available evidence." Owens, 908 S.W.2d at 928. Because the post-conviction court is vested with the discretion to determine the necessity of such expert services, this court must affirm the decision of the post-conviction court unless the facts show an abuse of discretion. See Owens, 908 S.W.2d at 929.

We cannot conclude that the post-conviction court abused its discretion. The court had already granted a total of $15,000 to be used for mitigation investigation. The post-conviction court

made a rationalized determination that an additional $8,500 for the purpose of "processing" already available information into mitigation themes was unnecessary. Likewise, the court was justified in finding that counsel was sufficiently capable of presenting to the court information regarding the appellant's substance addictions and the court was sufficiently capable of "processing" that information without the aid of an "expert." Additionally, the majority of this information was actually presented to the jury in this case through the testimony of Dr. Nurcombe. Finally, with regard to the fingerprint expert, given the overwhelming evidence of the appellant's guilt, even absent the fingerprint identification, we cannot conclude that the appellant would be able to establish prejudice on his ineffective assistance of counsel claim. Accordingly, we conclude that the post-conviction court acted within its discretion in denying the requested services.

### III. Denial of Continuance /Bifurcated Hearing at Post-Conviction Hearing

On October 13, 1998, one month prior to the scheduled evidentiary hearing, the appellant filed a motion to continue for six months. In requesting the continuance, the appellant relied upon "the recent appointment of co-counsel and the complexities of the case, the new developments in the mitigation investigation, the restricted availability of counsel McNally due to family concerns and obligations, and the need to consider additions to the defense team." After hearing arguments, the court continued the evidentiary hearing to January 19, 1999.

A second motion for continuance, or, in the alternative, a bifurcated hearing, was filed on December 22, 1998. In support of the motion, the appellant alleged (1) continuity of legal representation was interrupted when counsel was compelled to withdraw in August 1998, resulting in appointment of substitute counsel and (2) the complexity of the record-collecting and investigative requirements in this case. Notwithstanding, the appellant asserted that he would be ready to present evidence on all of the claims in his petition except for the claim that trial counsel did not properly investigate and present a mitigation case. The appellant requested a continuance of an additional four months in order to present evidence regarding this claim. The post-conviction court denied the motion on January 8, 1999, but noted that, if during the hearing on January 19th, the court should become aware of some fact warranting a continuance, counsel could "renew the motion to allow proof in at a further time."

On January 19, 1999, a renewed motion for bifurcation/continuance was filed by the appellant. In this motion, the appellant asserted that additional time was necessary in order to complete the mitigation investigation. Specifically, the appellant explained the complexity of the mitigation investigation due to the "transience" of the appellant's life. The motion was again denied.

In its order denying post-conviction relief, the court made the following findings of fact and conclusions of law:

> The Court is of the opinion that [appellant's] counsel not only had sufficient time to prepare, but had more than sufficient time to prepare. The undersigned judge has presided over nine (9) cases in which the State has given the death penalty notice, and seven (7) of those have gone to trial. This is the fourth post-conviction case

heard by the Court where the death penalty has been imposed. All of these cases have been marked by continuous and numerous motions to continue at every stage of the proceeding. It appears that lawyers in death penalty cases simply think that they <u>never</u> have enough time to prepare adequately. If the Court were to grant, without reflection, all the motions to continue, then the death penalty trials would never be held and the petitions for post-conviction relief would never be heard. In this case the Court authorized considerable resources for use by petitioner's counsel in preparation of the case. The hearing was not held until thirteen (13) months after the first appointment of counsel. The Court is of the opinion that defense counsel was given every reasonable opportunity to be adequately prepared for the hearing which was held in January 1999. The Court continues to adhere to its rulings denying a continuance of the January 1999 hearing. <u>See</u> <u>State v. Hines</u>, 919 S.W.2d 573, 579 (Tenn. 1995).

The appellant contends that the post-conviction court's ruling denied him his right to present mitigation evidence at the post-conviction hearing and denied his right under <u>Ake v. Oklahoma</u> to present expert witnesses. At the post-conviction hearing, counsel argued that additional time was needed in order to complete additional investigation and collect additional records regarding the appellant's school performance, psychological records, and records of the appellant's behavior during periods of incarceration. Counsel asserted that these records were necessary to determine what "experts" would be needed. The appellant also presented the testimony of Julie Hackenmiller, the mitigation specialist retained to perform the investigation on the appellant. Hackenmiller identified several mitigation themes that had been developed through her investigation; yet, she stated that they needed to be developed further. She admitted that several areas had been made known at the penalty phase, *e.g.*, substance abuse and lack of social support, however, these areas had not been developed "thoroughly" at that time. Hackenmiller related numerous records that had not yet been received by the defense team. She acknowledged that, although the contents of these records were unknown and were speculative at best, the records were thought to reveal the location of several witnesses. Hackenmiller also explained that her investigation had been thwarted by the family's refusal to cooperate. Hackenmiller admitted that the only records that she had that were not relied upon during the penalty phase were the appellant's juvenile records from the Wilder Center.

It is well-established that the decision whether to grant a continuance rests within the sound discretion of the trial court. <u>State v. Hines</u>, 919 S.W.2d 573, 579 (Tenn. 1995), <u>reh'g denied</u>, (1996), <u>cert. denied</u>, 519 U.S. 847, 117 S.Ct. 133 (1996). Moreover, the denial of a continuance will not be disturbed unless it appears that the trial court abused its discretion and prejudice resulted to the accused as a direct result of the court's denial. <u>Id</u>. Additionally, in order to trigger post-conviction relief, the denial of a motion for continuance must implicate a constitutional right. <u>Harris v. State</u>, 947 S.W.2d 156, 174 (Tenn. Crim. App. 1996), <u>perm. to appeal denied</u>, (Tenn. 1997). Thus, the petitioner "must demonstrate, first, that the . . . court abused its discretion and , second, that its action rendered the [proceeding] fundamentally unfair." <u>Id</u>. (citing <u>Conner v. Bowen</u>, 842 F.2d 279, 283 (11th Cir.), <u>cert. denied</u>, 488 U.S. 840, 109 S.Ct. 107, and, <u>cert. denied</u>, 488 U.S. 864, 109 S.Ct. 164 (1988)). Rarely does a grant or refusal of a continuance reach constitutional proportions. <u>Id</u>. (citing

Knighton v. Maggio, 740 F.2d 1344, 1351 (5th Cir.), cert. denied, 469 U.S. 924, 105 S.Ct. 306 (1984)).

We are not persuaded by the facts presented that the post-conviction court's denial of the appellant's motion for additional time to investigate implicates due process. A bare claim that additional investigation could have been conducted is not sufficient to demonstrate unfair prejudice so as to support a motion for continuance. Unless an appellant can show that his substantial rights were prejudiced by reason of the denial of his motion for continuance, the appellate court will conclude that there was no abuse of discretion by the trial court in denying the motion. The appellant has failed to identify any prejudice affecting his conviction or sentence. Continuances may be granted for the purpose of securing the presence of identifiable witnesses if those witnesses' testimony is material and admissible. In this case, the appellant sought a continuance, hoping to secure witnesses, whose testimony was unknown, and to gather useful information which, at the time of the motion, was also largely unknown. From the date the appellant filed his petition for post-conviction relief on December 11, 1997, to the date of the post-conviction court's decision to deny his petition, February 8, 1999, nearly thirteen months had passed, and the appellant had already been granted an extension of time. In the present case, we conclude that the post-conviction court did not abuse its discretion.

## IV. Claims Identified in Verified Amended Petition for Post-Conviction Relief

In his final issue, the appellant asserts that he is entitled to relief on the twenty grounds raised in his verified amended post-conviction petition.[11] Without citation to the record, explanation, argument or citation to any legal authority, the appellant asks this court to rely upon the argument set forth in his petition, averring that he has not waived these claims. The State submits that these allegations have been waived. We agree. When an appellant fails to articulate reasons to support a conclusory statement, the issue may be deemed waived. Tenn. R. App. P. 27(a)(7); State v. McKay, 680 S.W.2d 447, 454 (Tenn.1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1412 (1985). See also Tenn. Ct. Crim. App. R. 10(b); State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.1995). With the exception of those specific claims properly addressed elsewhere in the appellant's brief, this court declines the appellant's invitation to address these issues. See id. Additionally, it appears that many of these claims have been previously determined on direct appeal.[12] See Tenn. Code Ann. § 40-30-206(h) (1997).

## Conclusion

---

[11]These grounds are specifically enumerated in footnote 5.

[12]The record indicates that the following grounds for post-conviction relief raised by the appellant were previously determined on direct appeal: (1) challenges relating to the voir dire of the jury; (2) conduct of prosecutor which inflamed the jury; (3) unconstitutional sentencing phase instructions; (4) presentation of false testimony at sentencing phase; (5) denial of expert services; (6) preclusion of mitigation evidence; (7) denial of jury comprised of fair cross section of community; (8) right of allocution; (9) constitutionality of death penalty; and (10) proportionality review.

After a thorough review of the record and the law applicable to the issues raised herein, we find that the appellant has failed to prove the allegations contained in his post-conviction petition. Accordingly, we accredit the excellent and thoroughly prepared findings of the trial court in denying post-conviction relief. The judgment of the trial court is affirmed.

_____
DAVID G. HAYES, JUDGE